KIRNO HILL CORPORATION, Plaintiff,

v.

Thomas J. HOLT, Holt Hauling & Warehousing Systems, Inc., and Holt Marine Terminal, Inc., Defendants.

No. 76 Civ. 403.

United States District Court,
S. D. New York.

Aug. 10, 1979.

Cichanowicz & Callan, New York City, for plaintiff; Donald B. Allen, Michael J. Carcich, New York City, of counsel.

Shedd Moraites & Estreich, New York City, Marvin H. Gladstone, Hackensack, N. J., for defendant Thomas J. Holt.

Anderson, Russell, Kill & Olick, New York City, for defendants Holt Hauling & Warehousing Systems, Inc. and Holt Marine Terminal, Inc., John Gross, Nicholas Zoogman, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Kirno Hill Corporation ("Kirno Hill"), the owner of the M.S. Selene, time-chartered the vessel for one voyage from US-Gulf to the Red Sea/Persian Gulf area. The charter party was executed by the contracting parties on August 22, 1975; the named charterer therein who signed the document is Waterside Ocean Navigation Inc., a New York corporation ("Waterside-New York") by Jon C. Pendleton, who negotiated the terms with the owner's agents.

Kirno Hill instituted this action in admiralty to recover the unpaid charter hire, the cost of discharging the cargo and other expenses claimed to be due under the charter. However, recovery is sought not from Waterside-New York but from the defend-ants, Thomas J. Holt, the sole stockholder and chief executive officer of Waterside Ocean Navigation Inc., a Pennsylvania corporation ("Waterside-Pennsylvania"), Holt Hauling & Warehousing System Inc. ("Holt Warehousing") and Holt Marine Terminal Inc. ("Holt Marine"). The latter two defendants ("corporate defendants") and a third corporation, B. W. Sobelman & Co., Inc. ("Sobelman"), together referred to as the Holt Cargo System, are engaged in trucking, stevedoring and warehousing cargoes intended for foreign shipment and, in connection with such activities, conduct an ocean terminal facility in Gloucester, New Jersey. Thomas Holt is the chief operating officer of the companies and owns forty-three percent of the stock in Holt Warehousing.[1]

Essentially, the plaintiff's claim is that Waterside-New York was the agent of the defendants herein who were undisclosed principals, and in fact, were the charterers of the M.S. Selene and so are liable for the claimed unpaid charges. Plaintiff further asserts that Thomas Holt formed Waterside-Pennsylvania, bearing the identical name to Waterside-New York, to use it as a conduit to collect freight monies for cargo shipped aboard the M.S. Selene, which instead of being applied to pay amounts due under the charter were diverted by Holt or at his direction to the other defendants, Holt Warehousing and Holt Marine. The defendants deny plaintiff's charges and assert that, in fact, Waterside-New York and Pendleton were the charterers of the vessel, and that various payments made by Waterside-Pennsylvania for hire, fuel, and other operating expenses of the vessel were made on behalf of Waterside-New York and Pendleton and were loans to them. Thus the basic issue, broadly stated, is whether the defendants or Waterside-New York was the charterer of the M.S. Selene, or alternatively stated, whether charter-hire payments made by Waterside-Pennsylvania were on

---

1. Holt Warehousing is a Pennsylvania corporation doing business in New Jersey. Holt Marine is a New Jersey corporation and is a wholly-owned subsidiary of Holt Warehousing; Sobelman, a Pennsylvania corporation, is a wholly-owned subsidiary of Holt Marine. Another company, Holt Motor Express Inc. is also considered part of the Holt Cargo System; Thomas J. Holt was also the operating executive of this corporation.

its own behalf or were advances on behalf of Waterside-New York to be repaid out of freight collections.

Pendleton, the sole stockholder of Waterside-New York, commenced business under that name about March 1975 as a general agency to secure shipping principals. Pendleton and Holt, who had known one another for some years, met at or about that time. Pendleton testified that at that meeting he was engaged to solicit and develop business for the Holt terminal, trucking and storage operations and for such services, he was to receive an immediate retainer of $5,000, and thereafter, a retainer of $500 per week; that these payments were made by Sobelman until November 1975, when they were discontinued following a falling out between Thomas Holt and him. Pendleton further testified that in June 1975 Holt, because of extremely favorable market conditions in the volume of cargo going through the Holt terminals to the Middle East area, wanted to get a portion of such steamship business for himself and asked Pendleton to see about available vessels for charter to carry cargo. Pendleton, thereafter, canvassed the market and kept Holt informed of essential details of proposed charters. A number of vessels were chartered before the fix of the M.S. Selene on August 22, 1975. With respect to these charters, Pendleton also testified that Holt required Waterside-New York to sign as the charterer since he was concerned that customers, steamship lines using the Holt terminal and warehousing facilities, would, to say the least, be displeased if they knew that Holt was in competition with them. Pendleton testified that for these services in procuring chartered vessels and cargo for shipment on behalf of Thomas Holt, Waterside-New York was to receive five percent of the gross freight of the chartered vessels plus 1¼% address commission.[2]

The evidence establishes that with respect to the M.S. Selene, Holt, through Waterside-Pennsylvania, made payments for hire, bunkers, canal tolls and other operating expenses and that, on a number of occasions, Holt played an active role in connection with the vessel's operations.

The evidence also requires a finding that freight payments for carriage of goods on the M.S. Selene were received directly by or channeled to Waterside-Pennsylvania; that Holt Cargo System employees from time to time picked up freight monies received by Waterside-New York; and that, on occasion, freight monies were sent by Pendleton's agents to Waterside-Pennsylvania. In sum, Waterside-Pennsylvania received revenue derived from the vessel's operations and made payments required under the charter, except those sought to be recovered by this action. This pattern was followed in the instance of the other three vessels chartered by Pendleton for Holt.

Holt's version of his relationship to Pendleton is sharply different. As to the $5,000 payment and the $500 weekly "retainer" paid to Pendleton, Holt swore that he was aware that Pendleton had been out of employment from early in 1975 and was virtually destitute and desperately in need of funds, and that he agreed to loan Pendleton $5,000 and, thereafter, advance $500 per week for living purposes—in other words, that this was a personal loan transaction. As to the very substantial sums, more than $2,000,000 paid for operating costs of the chartered vessels, including the M.S. Selene, Holt swore that these were not payments under the M.S. Selene charter but loans to Waterside-New York, repayment to be made by Waterside-New York from the proceeds that chartered vessels would generate, and that the chief purpose of the incorporation of Waterside-Pennsylvania was to expedite such loans. It is undisputed that no loan instrument or covering letter evidencing the transaction of the alleged loans was ever requested of Waterside-New York or Pendleton; no interest was arranged for and no demand was ever made for repayment. A substantial part, if not all, of the sums Holt claims were advances to Waterside-New York in connection with the charter were borrowed by

2. Address commission is payable by owners of the vessels to the charterers.

Holt or Waterside-Pennsylvania from The First Pennsylvania Bank with guarantees executed by various Holt companies. So, too, no written agreement or document of any kind was executed with respect to payments described by Holt as personal loans to Pendleton—that is the $5,000 retainer and the $500 weekly payment to Pendleton.

Obviously, the Pendleton and Holt versions are utterly irreconcilable. Based upon objective extrinsic evidence, the demeanor of the two variant witnesses and Holt's own statement, the Court is persuaded that Pendleton told the substantial truth as to their relationship. The conclusion is compelled that Holt was the principal and the charterer of the vessel. The fact is that Holt saw what he thought was a lucrative market in the chartering of vessels going to the Middle East and sought to conceal such activities from customers using the Holt Cargo System facilities to avoid the possible loss of their business. Holt's incorporation of Waterside-Pennsylvania was a facade. Waterside-Pennsylvania was his alter ego. Confirmation that Holt was the charterer appears in a four-person tape-recorded telephone conference wherein Holt made it unmistakably clear that Pendleton, and the Waterside-New York corporation, were to charter vessels for Holt's account, and that later he would form his own corporation to charter vessels. In addition, Holt's testimony of loans of more than $2,000,000 to one he described as virtually destitute borders on the absurd and taxes credulity beyond belief. Common sense requires its rejection.

■ Other evidence leaves no room to doubt Holt's role as the charterer of the vessel. On Holt's instructions, bills received from suppliers and those furnishing services were sent on by Waterside-New York to Waterside-Pennsylvania for payment. Communications from the ship's owners setting forth balances due under the charter were forwarded by the New York corporation to the Pennsylvania corporation. Pendleton, under instructions of Holt, went to the Middle East regarding the Selene and another vessel. Additionally, loan documents delivered to The First Pennsylvania Bank make it abundantly clear that Waterside-Pennsylvania obtained financing for the express purpose of chartering vessels, including the M.S. Selene. The letter requesting a line of credit for chartering of vessels includes a projection of ship-charter revenue and expenses for a twelve-month period. One document indicates with particularity that Holt and his Waterside-Pennsylvania were in the ship-chartering business, i. e., a transmittal by The First Pennsylvania Bank to a Swiss bank of $124,000 for Kirno Hill and marked "hire Selene"—a transmittal on behalf of Waterside-Pennsylvania. Other evidence gives added support to the finding that Waterside-Pennsylvania and Holt were the charterers of the vessel. In October, Waterside-New York sent invoices totalling $12,243.75 for commissions owed to it by Waterside-Pennsylvania, which the latter paid on October 22, 1975. In sum, the evidence overwhelmingly establishes that in fact Thomas Holt was the charterer of the vessel, M.S. Selene, and that Waterside-New York acted as his agent in that transaction, all of which was unknown to the plaintiff. Accordingly, plaintiff is entitled to judgment against Thomas Holt as the undisclosed principal.[3]

■ Plaintiff also seeks to hold Holt Warehousing and Holt Marine for the unpaid amounts due under the charter party. Initially, plaintiff pressed for recovery against these defendants under a not too clearly articulated theory in reliance upon the doctrine of piercing the corporate veil—a concept recently referred to by our Court of Appeals as one that is "hardly as clear as a mountain lake in springtime."[4] This broadside charge was abandoned upon

**3.** *Dietrich v. United States Shipping Board Emergency Fleet Corporation,* 9 F.2d 733, 739 (2d Cir. 1925), *cert. denied,* 278 U.S. 647, 49 S.Ct. 82, 73 L.Ed. 560 (1928); *Industrial Mfrs., Inc. v. Bangor Mills, Inc.,* 283 App.Div. 113, 126 N.Y.S.2d 508 (1st Dep't 1953), *aff'd,* 307 N.Y. 746, 121 N.E.2d 552 (1954); *Puleo v. Rua,* 141 N.Y.S.2d 156 (Sup.Ct.1955).

**4.** *Brunswick Corporation v. Harry Waxman, et al.,* 599 F.2d 34, at 36 (2d Cir. 1979).

the conclusion of the trial.[5] Instead, plaintiff contends that the corporate defendants also were undisclosed principals in the charter of plaintiff's vessel. To buttress this contention, it relies upon the fact that all Holt companies were under the direction and control of Thomas J. Holt; that they shared common offices; that the loans made to Holt's wholly-owned subsidiary, Waterside-Pennsylvania, by The First Pennsylvania Bank (the proceeds of which were used for the vessel's operation) were guaranteed by the corporate defendants, Sobelman and other Holt companies; that the corporate defendants received the benefits of the charter party by way of advances or loans derived from freight proceeds; that together with Holt the corporate defendants had "a real stake in the venture and were de facto charterers." And finally, plaintiff urges that, even if these corporate defendants are found not liable as undisclosed principals, this Court, sitting in admiralty and in the exercise of its equitable power to do justice, hold them liable on the "theory of quasi-contract and/or unjust enrichment" because they "received the benefit of plaintiff's performance of the charter party agreement."[6] The mere assertion of these legal concepts does not establish the factual underpinnings required to warrant their application.

Preliminarily, it is observed that Waterside-Pennsylvania owns no shares in either of the corporate defendants and the corporate defendants own no shares in Waterside-Pennsylvania, which, as previously noted, is 100% owned by Thomas J. Holt. It has not been shown that either corporate defendant exercised any control or dominion over Waterside-Pennsylvania or Thomas Holt. Indeed, if anything, the reverse is true. Holt used Holt Warehousing and Holt Marine (and other Holt companies) to bolster Waterside-Pennsylvania's operations and committed their credit standing to guarantee the loans made by The First Pennsylvania to Waterside-Pennsylvania. In these circumstances, the fact that they guaranteed the loans does not establish that they were charterers of the vessel or beneficiaries of charter-party freight payments. It is true that there were advances by Waterside-Pennsylvania to the corporate defendants but the basic nature of these inter-company transactions were not established by plaintiff—there was no showing what disposition was made of the funds. Neither these transactions, which were not clearly identified, nor the fact that all Holt companies used common facilities such as space, telex and letterheads, upon the state of this record, support plaintiff's claim that the corporate defendants had a stake in the chartering of plaintiff's vessel. While Thomas Holt was the dominant force in all the Holt Cargo System companies and caused them to guarantee the borrowings of his 100%-owned Waterside-Pennsylvania, such actions were in furtherance of his own venture as the charterer of the vessel.

The corporate defendants were not known to plaintiff until after defaults in charter payments occurred. Plaintiff did know of one Holt company—Sobelman. During the course of negotiations for the charter of the vessel, plaintiff inquired who was "sitting in back of the charterers" and the information conveyed to plaintiff's agent, at the direction of Holt, was that it was Sobelman. Thus, to the extent that any claim may be advanced that plaintiff relied upon a Holt company, such reliance could only have been upon Sobelman, incidentally, not named as a defendant in this action. Upon all the circumstances, there is no basis, as plaintiff urges, for this Court to apply its "equitable power to do justice" by holding the corporate defendants liable. In sum, plaintiff has failed by the required degree of proof to sustain its claim against Holt Warehousing and Holt Marine.

There remains for final consideration the amount of damages plaintiff is entitled to recover against Thomas J. Holt. Plaintiff seeks a recovery of the balance due of $399,161.03. The defendants dispute the

---

5. T.R. 669, 674.

6. Plaintiff's Post-Trial Proposed Conclusion of Law, No. 5.

amount requested by the plaintiff. The issue centers about the charterer's failure to discharge the cargo at the port of Jiddah (Red Sea) requiring the plaintiff as owner of the vessel to take over in order to effect a proper discharge. The discharge operation at Jiddah involved an expenditure of $63,735.05, which the Court finds is reasonable and was necessarily incurred because of the charterer's breach of the charter party.

The defendants contend that the discharge of the cargo at Jiddah effected redelivery to the owner of the vessel. Consequently, they contend that the charterer is not liable for $57,019.65, canal transit, fuel and insurance expenses incurred for the continuation of the vessel's voyage to Port Said, Suez Canal. Contrariwise, the plaintiff-owner argues that since the charterer failed to complete delivery at Jiddah it had the right to exercise the option as to the port of redelivery, and that market conditions justified Port Said, a Mediterranean port, and that the expenses incurred are recoverable items of damage. The charter contains a clause requiring the charterer to give advance notice of redelivery of the vessel. The defendants' expert agreed that a four-week advance redelivery notice was applicable under the terms of the charter. The purpose of the redelivery notice, the expert conceded, was to afford the owner a reasonable opportunity to effect a new charter at the port of redelivery and that there were two options, either redelivery in the Red Sea or, redelivery in the Mediterranean. Upon the charterer's failure to give the required advance notice prior to the discharge of the cargo at Jiddah (Red Sea), the owner decided that the best opportunity to secure a new charter was to proceed to Port Said (Mediterranean) as the port of redelivery. In absence of advance notice of redelivery by the charterer, the action of the owner was reasonable and it is entitled to the expenses in proceeding from Jiddah to Port Said. Accordingly, plaintiff is entitled to judgment against the defendant, Thomas J. Holt in the sum of $398,161.03, with interest to be computed from January 30, 1976, representing the balance due as shown below:

### Debit

| | | |
|---|---|---|
| 1. | Hire: 142 days, 6 hours, 25 minutes at $4,000/day | $569,069.44 |
| 2. | Expenses of agent to arrange discharge | 3,480.62 |
| 3. | Discharge at Jiddah | 60,254.43 |
| 4. | Suez Canal transit—northbound including agency, pilot, etc. | 32,000.00 |
| 5. | Extra war risk insurance—Suez Canal | 5,921.25 |
| 6. | Delivery Bunkers (Suez Canal transit) | 19,098.40 |
| | Total | $689,824.14 |

### Credit

| | | |
|---|---|---|
| A. | September 12, 1975 | $117,500.00 |
| B. | September 18, 1975 | 6,500.00 |
| C. | October 23, 1975 | 43,663.11 |
| D. | November 13, 1975 | 124,000.00 |
| | Total | $291,663.11 |
| | Due to Plaintiff— | $398,161.03[7] |

7. Plaintiff incorrectly computed the balance due.

Judgment may be entered as indicated above in favor of plaintiff against defendant, Thomas J. Holt, and in favor of the defendants, Holt Hauling & Warehousing System Inc. and Holt Marine Terminal System Inc., dismissing the complaint upon the merits.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.